The Chawcelloe.
The executors of the last will of William Gibbons, deceased, filed their bill for a settlement of the estate in this court. The only parties to the suit are the executors, who are the complainants, and the four children of the testator, and Ward McAllister, who married one of the daughters, defendants.
Upon the coming in of the master’s report, to whom a reference was made to take the accounts of the executors, Ward McAllister and wife filed exceptions to that report. It is upon these exceptions that the case is now presented.
The controversy between the parties has given rise to several important questions involving the true construction of the testator’s will.
The first exception is as follows: “ For that the report contemplates that the funds provided by the third, fifth, and twelfth items of the will of the testator, William Gibbons, deceased, shall first be applied to the payment of debts; whereas, by the terms of the said will, the general revenues of the estate mentioned in the second item *232 of the will should be charged primarily with the payment of debts, in relief of funds mentioned in the third, fifth, and twelfth items.”
The testator did intend to designate the fund out of which his debts should be paid. His determination, that the payment of his debts should be the first duty discharged by the execjitors in the settlement of his estate, is to be seen on every page of his will. To secure this leading object he binds his whole -estate, and declares that no devise or bequest shall take effect until all his just debts are paid. The testator evidently drew the will himself. He has, by vain repetitions, made that obscure, which he intended should be clear, definite, and certain.
By the second item of his will, the testator declares, “ I do order and direct that all my just debts be paid and freely discharged, for which purpose I bind my whole entire and undivided estate; and I direct that my estate shall not be divided, and no devise or bequest take effect, until all my just debts are paid and fully discharged from the general revenues of my estate, together with such appropriations as are herein after mentioned and provided.”
The testator’s estate consisted of a large real estate, furniture in his dwelling, stock upon his various farms, money on hand, bonds and mortgages, and bank stock. He specifically devised and bequeathed the whole of his estate to his four children, except certain personal property specified in the third, fourth, fifth, and twelfth items of the will, making a residuary clause evidently for the purpose of providing against any omission he might have made in specifying so extensive a property, declaring that all the rest and residue of his estate, real and personal and mixed, or wherever it might be situated or found, that he died possessed of, not in his will enumerated, provided for, given, granted, devised, or bequeathed, or in any manner disposed of, he did give, grant, demise, and bequeath to his son William Hayward Gibbons, his heirs and assigns, for ever. The testator did not intend to die *233 intestate as to any of his property, real or personal: this is manifest from the whole will.
By the “third item” of his will, the testator orders that his whole and entire stock of blood horses shall be sold at public auction, in the month of May or October next following his death, and the proceeds of the sale appropriated to the payment of his debts, and the surplus, after that, be divided equally among his four children.
By the “ fifth item,” he orders all bonds secured by mortgages, promissory notes, and other obligations and contracts for the payment of money, except Ashbel Bruen’s bond of §12,000, secured by mortgage, and four bonds of the city of Savannah, to be collected with all possible despatch, and the proceeds applied to the payment of his debts, and any surplus, over and above what is sufficient for that purpose, to be equally divided among his four children.
By the “twelfth item,” he directs that all money on hand in any bank with which he kept an account, and at his dwelling house, or elsewhere, also all and every balance of account for money or funds due him in the hands of all and any of his agents or attorneys, or persons with whom he might have dealings in any part of the world, shall first be applied to the payment of his funeral expenses, then to the payment of his debts, then to the current temporary expenses of his children, at home or abroad, at school or otherwise, until the adjustment of his affairs in ascertaining the condition of the estate and their respective rights, and any balance remaining should go into his general estate, and be divided equally between his four children.
The exceptants insist that the testator intended the “general revenues” of the estate as the primary fund to pay his debts. He charged the “general revenues” of his estate, together with the appropriations made in the third, fifth, and twelfth items of his will, with the payment of his debts.
*234 What constitutes the general revenues of this estate ? I think it is plain the testator meant the rents and profits of his real estate, and the interest or profits arising out of the personal estate. He had made specific devises of all his real estate to his children. He had charged it with the payment of his debts. He had declared the devises should not take effect until all his debts were paid. As to his personal property, he makes a specific appropriation of the whole of it. He appropriates a part of it to secure a trust fund; another portion of it he directs his executors to convert into money to pay his debts; another part to convert into money to pay his funeral expenses; then his debts; then the temporary expenses of his children until his estate should be settled ; and he then specifically bequeaths all the personal property he could enumerate, not before appropriated to his four children, making provision for a residue, if any. He does not mean the personal property in the third, fifth, and twelfth items to constitute a part of the general revenue. He had directed that to be converted into money. Nor did he mean the proceeds or interest arising out of that fund to make any part of that revenue; for, in the second item of the will, he distinguishes it from the general revenue, as the appropriations provided with the “ general revenues” to pay his debts. We then have two distinct funds, the general revenue of the testator’s estate, chargeable with his debts, and a fund which has been raised out of specific personal property, converted into money by the express orders of the testator. Which fund is to be first appropriated for the purpose ?
It appears to me to have been the intention of the testator, and that he meant the phraseology he used as an expression of such intention, that the appropriations made in the second, fifth, and twelfth items of the will should constitute the primary fund for the payment of his debts. And again, if there is an absence of an intention as to which fund shall be primarily liable, upon general princi *235 pies, the debts are first to be paid out of the property mentioned in the items enumerated.
The testator first charges all his estate, both real and personal, with the payment of his debts; but knowing it would not be necessary to sell his real estate for that purpose, nor to break in upon the specific legacies which he had made to his children, he declares that the revenues shall be used for that purpose, together with such other appropriations as he makes. The word “appropriations” is significant. It evinces the intention of the testator to designate and set it apart from his other property for a specific object. The word means a designation to a particular exclusive use. He orders his blood horses to be sold, and certain obligations to be collected with all possible despatch, to constitute a fund in the hands of his executors to pay his debts. It cannot be that he meant the “revenues of his estate as the primary fund,” and this fund, thus “ear-marked,” as it were, and “appropriated” to the very object, to be a secondary or auxiliary fund. The revenues of the estate are sufficient to pay the debts without tlxe aid of the appropriations in the second, fifth, and twelfth items of the will. Did the testator ever contemplate such a result as that these appropriations should never be used for this object? It is quite as clear he could not have meant the two funds as a common fund to pay the debts. What proportion of tire burthen was each fund to bear, and at what period was the account to be taken ? I think, too, the intention of the testator is clear from another circumstance. He manifested a great anxiety to have his debts paid speedily. The fund created by the third, fifth, and twelfth items of his will was a certain fund in the hands of his executors immediately upon their assuming the duties of their office. It was a fund which appropriately belonged to the executors, in their character as personal representatives of the testator. Not so with the rents and profits of the realty, which constituted the bulk of the “revenue” of the estate. They did *236 not pass into the hands of the executors ratione officii. They had no authority to collect them, except by the express or implied authority conferred upon them by the will. The will gives no express authority. It is only by implication that the executors possess it. The testator having authorized the rents to be appropriated, under certain circumstances, to pay his debts, and the duty of paying his debts devolving upon his executors, by implication, they are clothed with power to collect the rents. Sugden on Powers 133, 134 ; Chambers’ executor v. Tulane, 1 Stockton’s R. 146. The fact, that the testator expressed a great anxiety to have his debts speedily paid; that of the two funds charged with this burthen, one was a certain fund in the hands of his executors available at once, the other not belonging to them appropriately as executors, and the testator conferring upon them no express authority to obtain possession of it, all these considerations are of importance, as showing that the testator’s mind was not upon the revenue of his estate as the primary fund for the payment of his debts. To determine that such was his intention would mar the prominent feature in his will, his determination to have his debts speedily paid; it would embarrass the very object which seemed to swallow up all others in contemplation of the testator.
To my mind, the intention of the testator is clearly expressed upon the face of the will, that the property enumerated in the third, fifth, and twelfth items should constitute the primary fund to pay his debts. But if there is an absence of intention as to what part of his estate shall constitute the primary fund, upon well settled principles of law, the property named in these several items is the appropriate and primary fund for that object.
It is a settled rule, that the personal estate is the primary fund to pay the debts, and that it is not relieved from this burthen by the debts, in express terms, being charged upon the realty; and that wherein it is aided either by a *237 legal or an equitable fund, it must be itself in tlio first place applied. 1 Bro. C. C. 454, per Lord Thurlow.
This rule is within the control of the testator, and is not applicable where his intention to the contrary is either expressed or clearly implied. That intention must not be simply to charge the realty, but to exonerate the personalty.
The case of Lord, Inchiquin against French and, others (Ambl. Rep. 33) has some points very similar to the present one. I will only quote from the opinion of Lord Hardwicke, to show how tenaciously he adhered to the principle of appropriating the personal estate as the first fund for the payment of debts. “ The general rule of law and equity is, that the personal estate is the first fund for payment of debts; and as to proper legacies, it is considered as the only fund, both in the ecclesiastical and in this court: if, therefore, the personal estate is to be exempted from these charges, it must be so expressed, or it must appear from a plain necessary implication arising from the words of the testator; and in such case, if an implication or plain intention without express words, it must appear that the personal estate is given as a specific bequest in some shape.”
It is another rule as well settled, that personal property not specifically bequeathed must bo applied before specific legacies. Both these rules are violated if the revenue of the testator’s estate is taken as the primary fund for the payment of his debts.
The fund specified in the “ second item” of the will is derived from the rents and profits of the realty, which is specifically devised, and from interest accumulating from personalty specifically bequeathed. The presumption of law' is, that the purpose of the testator in thus disposing of his property by specific devises and bequests is that his gifts should not be defeated.
It was argued by the counsel of exceptants, that the third, fifth, and twelfth items of the will are specific lega *238 cies in favor of the four children chargeable with the payment of debts. Was this really the intention of the testator? Were those items induced by the consideration of his children being the objects of his bounty or by a desire to make provisions for the payment of his debts ? When he ordered his blood horses to be sold, was it for the purpose of creating a fund to divide among his children or to create a fund to pay his debts ? He had given all his other property, real and personal, to these same children, charged with the payment of his debts; but he selected out of his whole estate the specific property mentioned in the third, fifth, and twelfth items of his will, and orders that it shall be applied to the payment of his debts, and “any surplus that may appear” be divided among his children. This is a specific bequest for the payment of his debts with the residue, if any, to his children, and not a specific legacy to his children of property-charged with the payment of debts. Their specific interest is in what is left after the debts are paid, and not in the property subject to the debts. The appropriations of the fund to pay the debts was the primary and principal object of the bequest; the distribution of the residue was but secondary and incidental.
The first exception is not well taken, and must be overruled.
The second exception is, “l?or that the said master has reported that the surplus of the general revenues of the estate, after the payment of debts, should be distributed among the respective devisees, in the proportion in which they were received from their respective real estate devised to them in the will of the testator; whereas the testator, by his said will, directs the said surplus to be distributed among his four children equally.”
It is argued that this surplus is, by the twelfth item of the will, ordered to be distributed equally among the children ; or if not, then that the testator died intestate as to this surplus, in which case the same result would follow. *239 I have already remarked, that the testator did not intend to die intestate as to any of his property. This is very manifest from every part of his will. And I think it is clear that he intended, in the residuary clause, to embrace everything he had a right to dispose of not specifically disposed of in his will. His language is, “ All the rest and residue of my estate, real and personal and mixed, wherever it may be situated or found, that I may die possessed of, not herein before enumerated, provided for, given, &c., I do hereby give, &c., to my son 'William.” The argument is, that he did not di & possessed of the rents of his real estate and the interest on the obligations he held, which accrued after his decease. In construing a will, we are not to put a technical definition upon a word, or make of it a technical application, in order to control the disposition the testator has made of his property, but we are to look at the context to ascertain the testator’s intention, and give effect to that without any regard to the mere phraseology he has made use of. Looking at the whole will, I am satisfied that it was the intention of the testator that this residuary clause should embrace everything he had a right to dispose of not specifically devised or bequeathed, and that if this surplus is not specifically disposed of, it passes under the residuary clause to William II. Gibbons, the testator’s son.
It is further argued, that this surplus is specifically disposed of in the twelfth item of the will. By this item, the testator, after directing certain specific property to be applied, first to the payment of his debts, then of his funeral expenses, then of the current temporary expenses of his children for a certain period, directs that any balance remaining shall go into his general estate, and be divided equally between his four children. It is true we would naturally conclude, from this phraseology, that the testator had directed his general estate to be equally divided between his children; but, in looking at the context, we find no such disposition: and then the question arises, *240 what did the testator mean by his general estate, and had he made any disposition of it ? If he had, no presumption to the contrary can arise, by mere implication, from the language referred to. If the views I have before expressed, that the testator had specifically disposed of his whole estate, with a residuary clause simply to provide for any casual omission, this language cannot alter the specific disposition he had made of his property. But it is said, that the “ general revenues” derived from his estate, mentioned in the second item of the will, constituted the testator’s “general estate,” and although it was proceeds and interest of real and personal estate specifically devised and bequeathed, the testator did not intend it should go to the devisees and legatees, from the fact that he devised to them the realty and personalty out of which it was derived, because he declared that no devise or bequest should take effect until all his debts were paid; that his revenue had accumulated in the hands of the executors before the debts were paid, and consequently before any devise or bequest took effect. This brings us back to the first question we considered, whether the testator meant anything more than to charge the devises and legacies with the payment of his debts, and to make the revenues derived from them an auxiliary fund to the specific personal property appropriated for his debts. I have before stated it as my opinion, that it was the intention of the testator that the devisees and legatees should take their estates and legacies without diminution, except so far as it was necessary to ajjpropriate these proceeds to the payment of his debts in aid of other funds provided for the purpose. I think the master was correct in the principle he adopted, and that the second exception to his report is not well taken.
As to the third, fourth, fifth, sixth, seventh, and eighth exceptions, if they are true in point of fact, that is if the master has stated the accounts in the manner as alleged by those exceptions, then they are well taken. They *241 involve the question, as to what burthen the revenues of the estate in the hands of the executor derived from the proceeds of real estate specifically bequeathed should bear, and in what proportion they should be charged ?
There is some embarrassment arising from the fact of the incompleteness of the master’s report. The object of the bill is a final settlement of the estate of the testator, to adjust all the rights of every person in any way interested in the estate, and the final settlement of those rights. The four children of William Gibbons are the only devisees and legatees of the will. The real and personal estate were devised and bequeathed to them in different proportions. From the peculiarities of the will, the rents of the real estate and interest money arising out of specific legacies have come into the hands of the executors. The object of the bill is not simply to ascertain the receipts and expenditures and the balance in their hands to be distributed, but to settle the accounts between the executors and the children; to ascertain the balance due them, respectively, from the executors, and to decree the payment of such balance. The master has not stated these accounts. Upon his report a final decree cannot be made definitely settling the rights of all the parties. The report should come to the court in such a shape that it may see how much money is in the hands of the executors belonging to each of the children, and may make a decree in their behalf accordingly. The court will not make a decree in this cause which leaves the children in a situation which may possibly compel them to institute a farther suit to ascertain and recover what is respectively due them.
I shall refer the report back to the master, to state an account between the executors and each of the children, with directions to charge the repairs, taxes, insurance, and every other expense incidental to any particular estate, to the devisees of such estate; and in their account with each child, to charge the executors with such part or pro *242 portion of the revenues in their hands as have been derived from the estate or property specifically devised or bequeathed to such child.
As to the “ eighth” exception, it was understood, at the argument, that the matter of that exception had been adjusted.
The “ ninth” and “ tenth” exceptions are waived.
The “ eleventh” exception is not well taken as to the principle settled by the master, if the views I have expressed in reference to the construction of the will, and the directions I have given to the master as to stating the accounts with the devisees, are correct; but I think the master erred in determining that the principal money was to be distributed among the children of the testator.
The “twelfth” exception relates to the amount of commissions allowed the executor. I see no reason for interfering with the master’s judgment in this particular. The exception was not pressed at the argument, and is not allowed.
Exceptions to the master’s report were also filed on behalf of the executors. The only one of consequence relates to the Tainter annuity. The only difficulty appears to be as to facts, which, since the master’s report, have become better understood by the parties. These exceptions are referred to the master with the report, that he may look further into the facts which have given rise to the exception, and report accordingly. According to my understanding of the facts before the master, I think the exception well taken. I intend, however, by the reference to leave it an open question for the master.